**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**



VAUN MONROE

          Plaintiff,

   v.

COLUMBIA COLLEGE OF CHICAGO and
BRUCE SHERIDAN,

          Defendants.

No.

## COMPLAINT

Plaintiff Vaun Monroe ("Monroe" or "Plaintiff"), by his attorney, Thomas D. Rosenwein of Rosenwein Law Group, for his Complaint against Columbia College of Chicago ("Columbia" or "CCC") and Bruce Sheridan ("Sheridan"), states as follows.

### INTRODUCTION

1.    This is an action for race discrimination and retaliation pursuant to Titles VI and VII of the Civil Rights Act of 1964, as amended, and 42 U.S.C. § 1981, which prohibits discrimination on the basis of race and further prohibits retaliation for opposing or making charges regarding discrimination. In addition, this action is also for the supplemental state claims of interference with contract and prospective economic advantage.

### PARTIES

2.    Monroe, who is Black, was formerly a tenure-track assistant professor at Columbia in the Film and Video Department, with cross appointment in the Theater Department, where he taught screenwriting, directing, production and film studies. He was the first and only Black male hired as a tenure-track professor in the Film and Video Department.

3.      Monroe was born and raised in South Central Los Angeles. He served four years in the armed forces (earning an honorable discharge) before undertaking higher education.

4.      Monroe earned his BA at The Evergreen State College in Olympia, WA and his MFA in Film and Media Arts from Temple University in Philadelphia. He is currently in the process of obtaining his Masters in Public Administration with a Chief Diversity Officer Certificate from the University of Nevada-Las Vegas.

5.      Monroe is an award winning director and writer of plays and movies. His short films have been screened throughout the United States, Africa, Asia and Europe. His 2012 production of "Ceremonies in Dark Old Men" won five Black Theater Alliance Awards, including Best Production and Best Director. His 2011 production "Trouble in Mind" received the Chicago Critic's Award for Best Show.

6.      His writing credits include "A Joyful Noise-The Mahalia Jackson Story" (2013 screenplay); "A Blind Eye" (2011 video, also directed by Monroe); "Chicago" (2011 short film, also directed by Monroe); and "All the World's a Stage" (2008 screenplay, also directed by Monroe).

7.      His other directing credits include "To Kill a Mockingbird" (2015 play); "The Belle of New Orleans" (2013 short film); "Birthright" (2011 play); "Trouble in Mind" (2011 play); "Powder" (2011 play) and "Korean Adoptees Worldwide" (2008 documentary, collaborating director).

8.      He is also an accomplished educator, having taught as a visiting professor at Ithaca College, Cornell University and Morgan State University prior to his employment at Columbia.

9.     He is the former President and CEO of the National Association of Black Screenwriters. He also is the former Artistic Director of Chicago Scriptworks, a non-profit organization helping writers by having actors read aloud six screenplays a year from original scripts.

10.     Monroe is a member of the National Association of Diversity Officers in Higher Education, the University Film and Video Association, where he served as Script Caucus Chair and currently as Diversity and Inclusion Caucus Chair, the Modern Language Association, Society of Cinema Studies, and the Black Film Society.

11.     For over 15 years, Monroe has acted as producer for Stagolee Productions, with more than 12 screenplays and films to his credit.

12.     Columbia is a not-for-profit Illinois corporation, initially incorporated in Illinois in 1928 as "Columbia College," with its principal place of business located at 600 S. Michigan Avenue, Chicago, Illinois. The College educates students in diverse fields of the arts and media, offering undergraduate and graduate degree programs.

13.     Sheridan is a resident and citizen of this judicial district. He is an assistant professor at Columbia and the former chair of its Film and Video Department.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. §§ 1331 and 1343. The Northern District of Illinois has personal jurisdiction over Columbia and Sheridan because both reside and/or maintain offices in the District and do business in Illinois. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) in that Sheridan resides in this District, Columbia's principal place of business is in this District, the unlawful employment practices occurred in this District, the employment records relevant to such practice are maintained and administered in this District, a substantial part of the events or omissions giving rise to the claims occurred in this District, and Monroe was working and would still be working in this District but for the unlawful employment practices described herein.

16.     Monroe has satisfied the administrative requirements for his Title VII claims. He timely filed an EEOC charge asserting discrimination based on race and retaliation (No. 440-2014-02176) on February 7, 2014, and received a Notice of Right to Sue from the EEOC that was mailed on May 12, 2017 (the "right to sue letter" is attached hereto as Exhibit A). The complaint is timely filed within 90 days of Monroe's receipt of the right to sue letter.

## FACTS RELEVANT TO ALL COUNTS

17.     Nationwide, roughly 5 percent of all full-time faculty members at colleges and universities in the United States are Black. This percentage is significantly below the national population average of 12.6 percent. Even in Chicago, and at Columbia College Chicago, the largest film school in the world, Monroe was the first and only Black male on the tenure track in the department's history.

18.     When hired at Columbia beginning the Fall semester 2007, Monroe was an "above the line" professor, *i.e.*, hired to teach advanced courses in the specialties of screenwriting, directing and multicultural film studies in addition to introductory courses.

19.     Monroe was hired to teach two introductory courses for Fall 2007 semester, and spent the preceding summer preparing for those courses. On August 23, 2007 (one week before

classes began), Monroe was asked to take over for two courses that needed filling because the assigned teacher had been suddenly hired away. Those two courses were "Film Noir" and "Adaptation." Eager to please, Monroe agreed and started prepping for the two new courses, courses that were significantly different than the ones he was initially assigned to teach. The request itself was in violation of the American Association of University Professors ("AAUP") best practices as cited in "Supporting Women and Minority Faculty," accessible at http://www.aaup.org/AAUP/pubsres/academe/2004/JF/Feat/mood.htm?PF=1, which proposes a three month notice for course assignments for starting faculty.

20.     The Adaptation course was designed to "examine problems, obstacles, and reconstruction principles inherent in adapting a literary work for the screen." The literary work that Monroe chose to examine was Chester Himes' "A Rage in Harlem." When Monroe announced the work that would be the basis for the course on the first day class, three students dropped the class immediately.

21.     At the end of the 2007 Fall semester, students completed classroom evaluations of the Adaption course. Seven of ten students responded.

22.     In the evaluations, some students made pointed references to the "African-American content" of the class, which they found distasteful, including student evaluation comments from that class such as "We spent far too long nearly every week talking about issues of race…" and "If I wanted to take a class about African Americans and Film I will (sic) sign up for it." This is an example of the targeted evaluations that minority professors who teach classes that contain issues of race and class are sometimes saddled with, which distort the effect of student evaluations given the small numbers of respondents. (See, e.g., Smith, Bettye P. and Hawkins, Billy. Examining Student Evaluations of Black College Faculty: Does Race Matter?

*The Journal of Negro Education*, Vol. 80, No. 2 (Spring 2011), pp. 149-162)[1]

23.    In his second semester at Columbia (Spring 2008), Monroe taught a Cinema Studies class focused on the Black family, titled: "Black Is, Black Ain't: African-American Identity in Cinema," an overview of portrayals of African Americans in cinema from its inception to the present focusing exclusively on Hollywood narrative film. Monroe considered it important to offer this course since the department had not had a class in Black Cinema for over 20 years, and a number of minority students had pleaded with Monroe to teach it.

24.    The class of 17 students had twelve Black students and five white male students. Monroe had taught a version of that class successfully at every school he had taught at previously, *i.e.*, Ithaca College, Cornell University and Morgan State University. At Morgan, that class topped out at 75 students and other students filled the lecture hall and surrounding hallways to listen in on the lectures and conversations afterwards. However, at Columbia, only six of his 17 students completed the evaluation form, and five were negative.

25.    At the conclusion of his first year, Monroe's Department Chair (Sheridan) convened a meeting to review Monroe's performance. When Monroe presented the findings regarding student evaluations, Monroe referenced the distinct likelihood that implicit bias may have been at least partially responsible for the poor student evaluations, noting that historically minority and women faculty members that teach issues of race and class tended to have lower student evaluations, citing the Smith and Hawkins article, *supra*.

26.    Monroe's explanation was belittled and dismissed by Sheridan as "not assuming responsibility for my classroom" and "playing the race card." From that time forward, Sheridan

---

[1] Subsequently, Monroe taught the exact same class approximately one year later (2009 Spring semester) with the same assignments, homework and exams, with one exception. Monroe substituted "The Twilight Zone" for "A Rage in Harlem" and the results were telling, as the evaluations were all extremely positive, thus highlighting the issue of bias that affects Black faculty.

retaliated against Monroe for daring to raise concerns about discrimination and bias toward Black academics, including Monroe himself.

27. In his second year (2008 Spring semester), Monroe taught Screenwriting 2, which course focuses on writing feature length films. During the semester, Monroe was telephoned by his agent who advised that a potential client was alarmed at some information he had found posted about Monroe from one of his students. Monroe then discovered that a student in the Screenwriting 2 course had created a website called "Black Supremacy (Now with a Photo of the Beast!)" wherein he trashed Monroe's class. The student had found a picture of Monroe online to post alongside vile racist screeds against Monroe. The student bragged about inviting class members to join in and complain.

28. When Monroe contacted the Screenwriting Coordinator and the Department Associate Chair, both advised Monroe to do nothing. Neither Sheridan nor Columbia took any action with regard to the student's action, and affirmatively allowed the student to complete the student evaluation on the course.

29. Although this incident should have been evidence that, as a Black male faculty member, racial issues that Monroe had previously identified were real and tangible, Columbia continued to refuse to recognize the bias that Monroe faced.

30. By the third year of a tenure-track faculty member's employment at Columbia, such a professor is typically placed in a position of administrative authority by the department chair, usually as a coordinator, to enhance leadership skills and increase their professional value. This was the case with Monroe's white male peers -- Kevin Cooper, David Tarleton, Julian Grant, Lee Payton, Dan Rybicky and Zoran Samardzija -- as well as Monroe's white female peers, Karen Loop and KJ Mathieson.

31.     Although both the screenwriting and directing coordinator positions became open by Monroe's third year, and despite Monroe's eminent qualifications and the explicit recommendation by the faculty member leaving the Directing coordinator position for Monroe to assume that post, Monroe was passed over in favor of two "Senior Lecturers" for the position. Senior Lecturers are ranked below assistant professors, and both of the individuals selected for the coordinator positions by Sheridan had lesser qualifications than Monroe.

32.     At the same time, Columbia had undergone a significant change in the tenure process. An aspect of this change was the implementation of a formal "third year review." Monroe was the first person in the history of the Department to undergo this process.

33.     The purpose of the third year review is to give the tenure-track faculty member an honest assessment with respect to their performance so that they can use the information for improvement. However, the third year review also subjected the faculty member to a recommendation of "continuation" or "termination" based on the results of the assessment.

34.     Monroe prepared the documents that went into the third year review, and timely submitted them for assessment to his newly appointed faculty mentor and to Sheridan. Sheridan feigned agreement with the faculty mentor that Monroe's dossier was fine, and that he would pass with no difficulty.

35.     In October 2010, the third year review meeting was held in the Department. Contrary to Columbia's rules, Sheridan was unexpectedly present. Those rules provide, in pertinent part: "At a minimum, the Process will consist of a review of the tenure-track faculty member's Three-Year Dossier by the Department Chair and Reviewing Faculty, **independently**, and an interview with the faculty member by the Reviewing Faculty." (Emphasis supplied)

36.     In addition, Monroe's appointed faculty mentor and the person with whom

Monroe had worked most closely, was not present due to an unexpected hospitalization.

37.     At the meeting, Sheridan assumed leadership, and contrary to his prior representations to Monroe, discussed Monroe in negative terms outside of Monroe's presence, emphasizing the issue of student evaluations. Sheridan also presided over the Department vote.

38.     During Monroe's brief presentation to the committee prior to the vote, he referenced the documented problems with student assessments of minority professors while also pointing out that only a small sample of students actually completed the evaluations (now filled out online rather than when all are in class), which leads to distortions with such a small number of students reporting. Monroe also pointed out that overreliance on student evaluations was partially responsible for the larger problem of lack of minority professors in academia generally, and made a case for a more nuanced reading of his accomplishments.[2]

39.     As a result of Sheridan's unauthorized presence and intervention at the meeting, the third year committee declined to vote for either "continuation" or "renewal." Instead, they took separate votes on the three areas by which professors are measured for tenure, "Teaching and Curriculum Development" where the vote was 0 yes, 16 no, 1 abstention; "Creative or Scholarly Work," 16 yes, 1 no, and "College and Community Service," 9 yes, 8 no.

40.     Sheridan then submitted a report to the administration urging Monroe's employment termination.

41.     As a result, the Vice President of Academic Affairs, voted to terminate Monroe's employment, essentially on grounds relating to teaching.

42.     The decision to terminate Monroe's employment on the theory that his teaching performance was inadequate was made without the benefit of Columbia's mandated peer

---

[2] See, *e.g.*, "Are Student Evaluations Holding Back Women and Minorities? The Perils of 'Doing Gender and Race in the Classroom'" published at Chapter 12 in "Presumed Incompetent: The Intersections of Race and Class for Women in Academia," Utah State University Press, 2012.

classroom reviews (*i.e.*, reviews by faculty who sit in on classes). That is because, Sheridan, who was responsible for arranging such reviews, never did so. Accordingly, Monroe on his own initiative invited several of the Associate Chairs to observe his teaching, which three Associate Chairs did.

43.     Those Associate Chairs issued glowing evaluations of Monroe's classroom teaching, in direct contradiction to the earlier committee vote that had assessed Monroe's progress as a teacher based solely on student evaluations and Sheridan's negative assessment. However, Sheridan ignored these peer assessments and the Vice President for Academic Affairs followed Sheridan in also ignoring the peer reviews.

44.     Columbia's Provost advised Monroe of Columbia's grievance procedure, which allows a faculty committee, the External Review Committee ("ERC"), to review termination decisions based on three areas:

        a.     Violation of Academic Freedom;

        b.     Material prejudicial mistakes of fact concerning the faculty member's performance of accomplishment; and

        c.     Material, prejudicial deviations from the procedures established by this Statement (Section XII, C of the Statement of Policy on Academic Freedom, Faculty Status and Tenure, and Due Process).

45.     After a thorough review of the case, the ERC found that Monroe had a valid grievance based on clauses a. and b. above. In a statement dated January 14, 2011 the ERC made the following findings:

> "The ERC finds that under IV D. 1 of the Tenure document, the Film and Video Department did not abide by its stated procedures for evaluating the teaching of Vaun Monroe during his tenure track period."

*    *    *

"The ERC believes the lack of classroom observation reports to be a prejudicial deviation from procedures established by the Film & Video Department for evaluating tenure track faculty. In this case the lack of observation by tenured faculty—or the lack of documentation of observation –and a low percentage of student course evaluations placed a great deal of emphasis on the evaluations of a relatively small sampling of students."

46.  The grievance process allows for the department chair to respond to the ERC report, with Columbia's President as the final arbiter.

47.  Sheridan took the opportunity to respond by mischaracterizing Monroe's record, and again urging employment termination.

48.  For example, Sheridan characterized Monroe's co-teaching of a graduate Directing class in the Fall 2008 as causing the Department to incur a "greater direct evaluation/mentoring commitment to Mr. Monroe than the department guidelines required" when in fact Monroe co-taught the graduate directing class in his second year, which is routine for the position in the Department and as was stated in his hiring letter.

49.  Upon receipt of the ERC report and Sheridan's response, the then-President Carter reversed the recommendation to terminate Monroe's employment.

50.  Notwithstanding President Carter's decision, and as further punishment for Monroe's defense of Black academics, Sheridan then informed Monroe that he was removed from the above-the-line curriculum (*i.e.*, all advanced courses) and instead assigned him to teach in the Foundations program (entry level courses) for Fall 2011 and Spring 2012. Although presented as a one-year adjustment, Monroe was forced to teach the Foundations curriculum for the subsequent six consecutive semesters of his employment, and excluded from teaching his specialties, including courses he was specifically hired to teach. No other non-Black tenure track colleagues were so treated. Sheridan also falsely accused Monroe of failing to timely complete forms and stated that a written reprimand would be placed in Monroe's personnel records, even

though others in the Department who were not Black were not written up or otherwise punished for tardiness, real or alleged, in completing forms.

51.     Sheridan thereafter engaged in hyper-surveillance of Monroe's activities for purposes of finding fault while ignoring Monroe's requests for assistance and direction when issues arose in the Department. Sheridan used every opportunity to rebuke and ridicule Monroe, *e.g.*, falsely asserting that Monroe was inflexible in the classroom, was unreliable and incapable of working with other faculty and would not follow protocols. Sheridan selectively quoted negative student evaluation comments while ignoring overall statistics and peer reviews that were positive.

52.     Sheridan also interfered with Monroe's professional and creative work, *e.g.*, falsely denigrating Monroe to professional colleagues at the Goodman Theater and refusing to support Monroe's efforts to forge a relationship with Cinespace Studios which would have raised Columbia's film school rankings in comparison with other such programs nationally.

53.     When Monroe came up for his regularly scheduled tenure decision (which at Columbia, as at most academic institutions, is the decision made during the 6th year to retain a professor on a permanent basis or terminate employment with the school), the Department, now properly meeting separate from Sheridan as Chair, voted overwhelmingly in favor of Monroe's tenure. However, Sheridan issued a negative recommendation.

54.     The Dean overruled Sheridan, and recommended Monroe for tenure. However, on March 18, 2013, the interim Provost (who as Vice President for Academic Affairs had previously voted against Monroe in his third year evaluation) notified Monroe of her negative recommendation, denying tenure and promotion to Associate Professor on the ground that

Monroe "did not show strong evidence of excellence in teaching or professional distinction in creative endeavors or scholarship" a conclusion that parroted that of Sheridan.

55.     Monroe then filed a grievance with the ERC and also filed a complaint of racial discrimination, harassment and retaliation against Sheridan with Columbia's Office of Human Resources. The newly installed interim Vice President of Human Resources rejected the complaint.

56.     However, the chair of the ERC advised Monroe that the ERC felt that discrimination and retaliation had occurred in his case, but that pursuant to Columbia's rules, it was outside of the committee's purview to comment on such matters. Instead, the ERC looked only to procedural issues, and although the committee did find procedural irregularities, the committee only commented that they "might" have been significantly prejudicial in the decision to deny tenure.

57.     The ERC then inexplicably failed to timely notify Monroe of its decision. As a result, Monroe was delayed by three weeks in writing his response, which would be included in all the materials that the President reviews to reach the final decision on his tenure application.

58.     As a result of the delay, President Carter, who had previous knowledge of Monroe's case, was not able to decide the matter as he was then retiring from the office, leaving the decision to the new incoming President who had no previous experience at Columbia.

59.     Mere weeks after assuming the position, new President Kim was provided with Monroe's file, with the requirement to render a decision within 30 days. In reliance on Sheridan's negative recommendation, the new President ruled against Monroe, denying him tenure.

60. Monroe then reached out to the AAUP itself. That organization wrote to President Kim, stating that the decision to deny Monroe tenure after he had registered a charge of discrimination was grounds for a new hearing and that Columbia, in this matter, was in violation of best academic practices. Kim responded by advising the AAUP that Columbia would treat the AAUP's statement as a "suggestion" and would consider it for future cases. The NAACP also questioned Columbia's handling of Monroe's tenure application but was rebuffed.

61. Tenure and promotion is rarely denied at Columbia to non-Black candidates; by denying Monroe the tenure he had merited, as if he had failed to fulfill the stated criteria, Columbia effectively defamed Monroe to the academic public. Columbia has thereby severely harmed Monroe's prospects of future employment, with considerable economic damage and emotional distress.

62. As fate would have it, Sheridan, who as chair of the largest film department in the world already wields great power and influence, had even greater sway over Monroe's tenure application in that at every single point of review in the chain of command (The Dean, The Provost, The All College Tenure Committee, The External Review Committee, The President and The Associate Vice President of Human Resources), the position was occupied by a person or persons new to the job, creating a perfect storm for a "Cat's Paw" adverse action.

**COUNT I**
**VIOLATION OF TITLE VII (RACE DISCRIMINATION)**

63. Plaintiff restates and incorporates by reference the allegations set forth in paragraphs 1-62 as paragraph 63 of this Count I.

64. Title VII of the Civil Rights Act of 1964 prohibits discrimination in employment practices, and provides, in pertinent part (42 U.S.C. § 2000e-2), that it is an unlawful employment practice for an employer to "discharge any individual or otherwise to discriminate

14

against any individual with respect to… terms, conditions, or privileges of employment because of such individual's race…."

65.     As noted above, Monroe has satisfied the administrative requirements for his Title VII claims. He timely filed an EEOC charge asserting discrimination based on race and retaliation, and this complaint is timely filed within 90 days of Monroe's receipt of the right to sue letter. (Exhibit A).

66.     At all times pertinent to this complaint, Monroe was within a protected race (Black) as provided by Title VII.

67.     During the course of his employment, Monroe was subjected to different terms and conditions of employment because of his race (Black).

68.     Defendant Columbia's conduct as alleged above constitutes discrimination based upon race in direct violation of Title VII.

69.     As a result of Columbia's discriminatory conduct, Monroe has been damaged in his career and in his person and has suffered compensable damage.

**WHEREFORE,** Plaintiff Vaun Monroe prays for the following relief:

A.     An order declaring that Defendant Columbia violated Title VII;

B.     An order enjoining future violations and requiring Defendant Columbia to afford a working environment free from discrimination, including discrimination based on race;

C.     Reinstatement to his position as a ranked Professor with tenure, including all benefits that Monroe would have had but for Defendant Columbia's illegal conduct;

D.     Payment of all lost, past and future wages and benefits (including any and all types of compensation and benefits, back pay, and front pay);

E.     Treble damages due to the willful nature of Defendant Columbia's conduct;

F.      Compensatory, emotional and mental distress damages; reputational, punitive or exemplary damages; statutory and liquidated damages; and civil penalties;

G.      Payment of Monroe's attorney's fees and costs of litigation (including statutory fees and expert witness fees);

H.      Pre- and post-judgment interest; and

I.      All other relief, whether legal or equitable, that this Court may deem appropriate.

## COUNT II
## VIOLATION OF TITLE VII (RETALIATION)

70.     Plaintiff restates and incorporates by reference the allegations set forth in paragraphs 1-62 as paragraph 70 of this Count II.

71.     Monroe was subjected to different terms and conditions of employment, punished for complaining about explicit and implicit bias, and terminated for opposing and proposing changes to employment practices that discriminate and are in violation of Title VII.

72.     As alleged, *infra*, these actions occurred following Monroe's first year review and throughout his employment at Columbia, including after his appeal and the reversal of the attempt to terminate his employment following his third year review, when Monroe called attention to Columbia's failure to address discriminatory bias in its practices.

73.     Columbia's acts and omissions were materially adverse to Monroe, resulting in disparate terms of employment and ultimately termination of his employment.

**WHEREFORE,** Plaintiff Vaun Monroe prays for the following relief:

A.      An order declaring that Defendant Columbia violated Title VII;

B.      An order enjoining future violations and requiring Defendant Columbia to afford a working environment free from retaliation for complaints of discrimination, including discrimination based on race;

C.     Reinstatement to his position as a ranked Professor with tenure, including all benefits that Monroe would have had but for Defendant Columbia's illegal conduct;

D.     Payment of all lost, past and future wages and benefits (including any and all types of compensation and benefits, back pay, and front pay);

E.     Treble damages due to the willful nature of Defendant Columbia's conduct;

F.     Compensatory, emotional and mental distress damages; reputational, punitive or exemplary damages; statutory and liquidated damages; and civil penalties;

G.     Payment of Plaintiff's attorney's fees and costs of litigation (including statutory fees and expert witness fees);

H.     Pre- and post-judgment interest; and

I.     All other relief, whether legal or equitable, that this Court may deem appropriate.

## COUNT III
## VIOLATION OF 42 U.S.C. § 1981

74.     Plaintiff restates and incorporates by reference the allegations set forth in paragraphs 1-62 as paragraph 74 of this Count III.

75.     Title 42 U.S.C. § 1981 (a), (b) and (c) provides in pertinent part:

> "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce, contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind and to no other.

> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

> The rights protected by this section are protected against impairment by nongovernmental discrimination …"

76.     At all times pertinent, Monroe was a person protected by the provisions of 42 U.S.C. § 1981.

77.     Columbia and Sheridan deprived Monroe of his rights granted by 42 U.S.C. § 1981 to "make and enforce contracts" when they deliberately and intentionally discriminated against him based upon his race by discrediting and demeaning his activities as a professor, refusing to assign him administrative responsibilities, refusing to assign him advanced courses, refusing to provide peer reviews of his courses, engaging in hyper-surveillance of his activities, selectively "cherry picking" negative student comments, overruling the determination of his Department peers on his tenure application and rejecting the evidence, both actual and scholarly, of bias in student evaluations.

78.     Columbia and Sheridan maintain a widespread pattern and practice of treating Black employees (based on their race) and especially Monroe, less favorably than his co-workers who are not Black. As recently as January 2017, a tenured Black professor in Columbia's Television Department, whom Columbia featured prominently in advertising campaigns, resigned due to the discrimination he experienced and criticized Columbia for its hypocritical treatment of Black faculty.

79.     Although Columbia's and Sheridan's practice is not authorized by written or express company policy, the practice of discrimination by means of disparate treatment and the maintenance of a hostile work environment is sufficiently permanent and well-settled as to constitute a pattern or practice of illegal intentional race discrimination in violation of 42 U.S.C. § 1981.

80.     Monroe has been subjected to and harmed by Defendants' systemic and individual discrimination.

**WHEREFORE,** Plaintiff Vaun Monroe prays for the following relief:

A.      An order declaring that Defendants violated 42 U.S.C. § 1981;

B.      An order enjoining future violations and requiring Defendant Columbia College Chicago to afford a working environment free from discrimination, including discrimination based on race;

C.      Reinstatement to his position as a ranked Professor with tenure, including all benefits that Monroe would have had but for Defendants' illegal conduct;

D.      Payment of all lost, past and future wages and benefits (including any and all types of compensation and benefits, back pay, and front pay);

E.      Treble damages due to the willful nature of Defendants' conduct;

F.      Compensatory, emotional and mental distress damages; reputational, punitive or exemplary damages; statutory and liquidated damages; and civil penalties;

G.      Payment of Plaintiff's attorney's fees and costs of litigation (including statutory fees and expert witness fees);

H.      Pre- and post-judgment interest; and

I.      All other relief, whether legal or equitable, that this Court may deem appropriate.

## COUNT IV
## VIOLATION OF TITLE VI

81.     Plaintiff restates and incorporates by reference the allegations set forth in paragraphs 1-62 as paragraph 81 of this Count IV.

82.     Title VI of the Civil Rights Act, 42 U.S.C. § 2000 *et seq*., provides, in pertinent part, that "[n]o person in the United States shall on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of or be subjected to discrimination under any program or activity receiving federal financial assistance."

83.     Columbia accepts and receives funding from the federal government for, *inter alia*, educational scholarships, grants and loans.

84.     Such funding includes federal and state funds through the U.S. Department of Education and other federal agencies, and is based, in part, on the minority composition of Columbia's student body and faculty.

85.     Columbia and Sheridan denied Monroe participation in and benefits of Columbia's programs by subjecting him to discrimination based on his race when they deliberately and intentionally discredited and demeaned his activities as a professor, refused to assign him administrative responsibilities, refused to assign him advanced courses, refused to provide peer reviews of his courses, engaged in hyper-surveillance of his activities, selectively "cherry picked" negative student comments, overruled the determination of his Department peers on his tenure application and rejected the evidence, both actual and scholarly, of bias in student evaluations.

86.     Columbia and Sheridan treated Monroe differently from non-Black professors.

87.     As a result of Defendants' discrimination, Monroe has suffered damages in the nature of loss of employment, harm to his career, emotional distress, embarrassment and the deprivation of his civil rights.

**WHEREFORE,** Plaintiff Vaun Monroe prays for the following relief:

A.      An order declaring that Defendants violated Title VI;

B.      An order enjoining future violations and requiring Defendant Columbia College Chicago to afford a working environment free from discrimination, including discrimination based on race;

C.      Reinstatement to his position as a ranked Professor with tenure, including all benefits that Monroe would have had but for Defendants' illegal conduct;

D.      Payment of all lost, past and future wages and benefits (including any and all types of compensation and benefits, back pay, and front pay);

E.      Treble damages due to the willful nature of Defendants' conduct;

F.      Compensatory, emotional and mental distress damages; reputational, punitive or exemplary damages; statutory and liquidated damages; and civil penalties;

G.      Payment of Plaintiff's attorney's fees and costs of litigation (including statutory fees and expert witness fees);

H.      Pre- and post-judgment interest; and

I.      All other relief, whether legal or equitable, that this Court may deem appropriate.

## COUNT V
## INTENTIONAL INTERFERENCE WITH CONTRACT

88.     Plaintiff restates and incorporates by reference the allegations set forth in paragraphs 1-62 as paragraph 88 of this Count V.

89.     Monroe had a valid contract with Columbia.

90.     Sheridan was aware of the contract between Columbia and Plaintiff, and specifically that Monroe was entitled to tenure and renewal of his contract because he met the criteria set by the school for tenured employment.

91.     Sheridan intentionally and unjustifiably induced Columbia to breach its contract with Monroe by falsely alleging that he was a divisive member of the faculty who was unwilling to collaborate with others, and a poor teacher who covered up his inadequacies by "playing the race card." Sheridan knew that Monroe was not divisive, non-collegial or a poor teacher, but in fact was the object of harassment in which Sheridan participated.

92.     Sheridan was not privileged to induce the breach of contract. He interfered with Monroe's contract in order to harm Monroe by causing him to be terminated from employment.

93.     As a result of Sheridan's discrimination, Monroe has suffered damages in the nature of loss of employment, harm to his career, emotional distress, embarrassment and the deprivation of his civil rights.

**WHEREFORE**, Plaintiff Vaun Monroe prays for relief against Defendant Sheridan in the amount of $1,000,000 in compensatory damages, $3,000,000 in punitive damages, plus interest and costs, and such other relief as this Court may deem proper and just.

### COUNT VI
### INTENTIONAL INTERFERENCE WITH
### PROSPECTIVE ECONOMIC ADVANTAGE

94.     Plaintiff restates and incorporates by reference the allegations set forth in paragraphs 1-62 as paragraph 94 of this Count VI.

95.     As a result of Monroe's accomplishments and his fulfillment of Columbia's criteria for tenure and promotion, Monroe had a reasonable expectancy of entering into a permanent relationship with Columbia in the nature of a tenured academic post.

96.     Sheridan was well aware of Monroe's reasonable expectancy as Sheridan knew Monroe had met all criteria under Columbia's standards.

97.     With full knowledge of Monroe's expectancy, Sheridan intentionally induced Columbia to deny Monroe tenure and promotion, by falsely criticizing his teaching and collegiality to disguise Sheridan's discriminatory bias. Sheridan knew that interference with Monroe's promotion and tenure was certain or substantially certain to occur as a result of Sheridan's conduct. Indeed, the primary purpose of Sheridan's conduct was to deprive Monroe of his expected tenured relationship with Columbia.

98.    As a direct result of Sheridan's conduct, Columbia refused to grant Monroe promotion and tenure, which was the intended result of Sheridan's conduct.

99.    Monroe has been injured by Sheridan's intentional interference with Monroe's prospective economic advantage in that he has been rendered unemployed at Columbia and has suffered reputational damage. By inducing Columbia to deprive Monroe of the tenure he had merited, as if he had not fulfilled the stated criteria, the false impression conveyed to future employers is that Monroe did not fulfill the published criteria of Columbia in creative work, teaching and service, thereby severely harming Monroe's prospects of future employment, with considerable economic damage and emotional distress.

**WHEREFORE**, Plaintiff Vaun Monroe prays for relief against Defendant Sheridan in the amount of $1,000,000 in compensatory damages, $3,000,000 in punitive damages, plus interest and costs, and such other relief as this Court may deem proper and just.

### PLAINTIFF DEMANDS TRIAL BY JURY ON ALL COUNTS

VAUN MONROE

Dated: August 10, 2017                              By:      s/ Thomas D. Rosenwein
                                                                      One of His Attorneys

Thomas D. Rosenwein (ARDC No. 2391597)
Rosenwein Law Group
53 W. Jackson Blvd., Suite 1205
Chicago, Illinois 60604
(312) 346-1080
E-Mail: trosenwein@rlawgrp.com

Kent Maynard, Jr. (ARDC No. 6205075)
Joel Daniel (ARDC No. 6312620)
Kent Maynard & Associates
53 W. Jackson Blvd., Suite 1205
Chicago, Illinois 60604
(312) 423-6586
E-Mail: service@kentmaynard.com