# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| VAUN MONROE ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 17-cv-5837 |
| ) | |
| COLUMBIA COLLEGE OF CHICAGO AND ) | Judge Thomas M. Durkin |
| BRUCE SHERIDAN, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Vaun Monroe brought this action against Defendants Columbia College of Chicago and Bruce Sheridan asserting claims of race discrimination and retaliation in violation of Title VII (Counts I and II), 42 U.S.C. § 1981 (Count III), and Title VI (Count IV); as well as intentional interference with contract and prospective economic advantage (Counts V and VI). Before the Court is Defendants' Motion to Dismiss Counts I, II, and III of the Complaint. For the reasons explained below, Defendants' motion is granted.

## BACKGROUND

Monroe was formerly a tenure-track assistant professor at Columbia in the Film and Video Department. He alleges that he was the first and only black male hired as a tenure-track professor in that department. R. 1 ¶ 2. From the Complaint, Monroe appears to be an accomplished screenwriter and director. *Id.* ¶¶ 4-11. Monroe alleges a history of discrimination stemming from his first year at

Columbia. He notes that his concerns about bias in his students' evaluations were ignored, and he was passed up for promotions over white, less qualified individuals.

At one point, Sheridan, his department chair, recommended Monroe's termination without proper review consistent with department policies. *Id*. ¶ 40, 42. Monroe filed a grievance with the Elected Representatives of the College ("ERC") and Sheridan's recommendation was eventually reversed by Columbia's then president. *Id*. ¶¶ 44-49. But the grievance allegedly resulted in further discrimination by Sheridan—Sheridan removed Monroe from teaching advanced and specialty courses to teaching only foundational courses. *Id*. ¶ 50. Sheridan also "engaged in hyper-surveillance" of Monroe's activities and falsely accused Monroe of failing to complete required forms. *Id*. ¶¶ 50, 51.

Eventually, when Monroe was considered for tenure, his department "voted overwhelmingly in favor of Monroe's tenure" while Sheridan issued a negative recommendation. R.1 ¶ 53. On March 18, 2013, the Provost denied Monroe tenure because he "did not show strong evidence of excellence in teaching or professional distinction in creative endeavors or scholarship." *Id*. ¶ 54. Monroe filed a grievance with the ERC and also filed a complaint of racial discrimination, harassment, and retaliation against Sheridan with Columbia's Office of Human Resources. *Id*. ¶ 55. Monroe then submitted materials for review of the decision to Columbia's president. President Kim denied Monroe tenure. *Id*. ¶ 59.

Monroe proceeded to contest the decision. He next wrote to the American Association of University Professors. *Id*. ¶ 60. The Association wrote to President

2

Kim, stating that the decision to deny Monroe tenure after he had made a claim for discrimination was grounds for a new hearing and that Columbia was in violation of best academic practices. President Kim responded that Columbia would treat the statement as a "suggestion" and would consider it for future cases. *Id*. ¶ 60.

Monroe filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on February 7, 2014. *See* R. 1-1. The EEOC issued an inconclusive determination on May 12, 2017 with the following explanation: "Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge." R. 1-1. The EEOC did not indicate the Charge was untimely filed. *Id*. Monroe filed this action on August 10, 2017.

**LEGAL STANDARD**

A Rule 12(b)(6) motion challenges the sufficiency of the complaint. *See Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under the federal notice pleading standards, a plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007). "In evaluating the sufficiency of the complaint, [courts] view it in the light most favorable to the plaintiff, taking as true all well-

3

pleaded factual allegations and making all possible inferences from the allegations in the plaintiff's favor." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). A defendant may raise the statute of limitations in a motion to dismiss if "the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense." *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005).

## DISCUSSION

### I. Title VII Claim (Counts I and II)

Defendants argue that Counts I and II are time-barred because Monroe's complaint with the EEOC was filed 326 days after the decision by the Provost to deny him tenure. Title VII claims of discrimination must be filed with the EEOC "within 300 days 'after the alleged unlawful employment practice occurred.'" 42 U.S.C. § 2000e–5(e)(1); *Hedrich v. Bd. of Regents of Univ. of Wisconsin Sys.*, 274 F.3d 1174, 1181 (7th Cir. 2001). Defendants argue that the Provost notified Monroe of her decision to deny him tenure on March 18, 2013, and accordingly, his EEOC filing on February 7, 2014 was 26 days too late.

Monroe makes three arguments in support of his position that his claims are not time-barred. First, he argues that the final decision denying him tenure was not made until August 12, 2013, when President Kim denied Monroe tenure. R. 21 at 4. Second, he argues that even if the operative date was the Provost's decision, the limitations period should be equitably tolled. *Id.* at 5. Finally, Monroe argues that the denial of his tenure was not the only adverse employment action against him,

and that discrimination against him continued through the termination of his employment in May 2014. *Id.* at 7-8. The Court will address each argument in turn.

### A. Date of Tenure Decision

Defendants argue that President Kim's decision was merely an affirmation of the denial, which is insufficient to toll the limitations period of Title VII. *See* R. 16 at 4-6. This timeliness issue is governed by the Supreme Court's decision in *Delaware State College v. Ricks,* 449 U.S. 250 (1980). There, the Court made clear that the operative date that commences a limitations period is the date a tenure decision is final, and that a grievance procedure does not toll the limitations period, because "[t]he grievance procedure, by its nature, is a *remedy* for a prior decision, not an opportunity to *influence* that decision before it is made." *Id.* at 261 (emphasis in original).

In *Ricks*, the College Board of Trustees of Delaware State College informed Ricks of its decision to deny him tenure in March 1974. *Id.* at 252. Ricks filed a grievance with a grievance committee, which held a hearing and took the matter under submission. *Id.* In the meantime, the Board of Trustees continued Ricks' termination proceedings. In June 1974, it informed Ricks that he would be offered a one-year terminal contract in accordance with Delaware State's policies. In September 1974, the grievance committee denied Ricks' grievance as to his tenure decision. *Id.* at 254. Ricks eventually filed a lawsuit under Title VII and 42 U.S.C. § 1981, which the district court dismissed as untimely. The Third Circuit reversed,

5

holding that the limitations period did not begin until Ricks' terminal contract expired in June 1975. *Id.* at 255.

The U.S. Supreme Court disagreed. The Court held that the June 1974 decision was the Board's "official position" and that although it indicated a willingness to change its decision if the grievance was found to be meritorious, that the Board was "entertaining a grievance complaining of the tenure decision does not suggest that the prior decision was in any respect tentative." *Id.* at 261. The Court also explicitly rejected the argument that the "pendency of a grievance, or some other method of collateral review of an employment decision" tolls the running of the limitations periods. *Id.* According to *Ricks* and Seventh Circuit precedent, the Court must determine when the adverse employment decision occurred, not when the grievance process was completed and the decision affirmed. *See Williamson v. Indiana Univ.,* 345 F.3d 459, 463 (7th Cir. 2003) ("[B]ecause the decision not to reverse an adverse employment decision is not a fresh act of discrimination, an employee cannot toll the limitations period by pursuing grievance proceedings.").

Monroe argues that President Kim's decision was not part of a grievance process, but rather the final decision to determine tenure. But that is not what he alleges. The Complaint notes, "Columbia's Provost advised Monroe of Columbia's grievance procedure, which allows a faculty committee, the External Review Committee [sic] ('ERC'), to review termination," and "[t]he grievance process allows for the department chair to respond to the ERC report, with Columbia's President

6

as the final arbiter." R. 1 ¶ 44, 46. Monroe followed that procedure. R. 1 ¶ 55 ("Monroe then filed a grievance with the ERC.").

Further, President Kim's letter on August 12, 2013 indicates his decision was on appeal: "my office received your written *appeal* in regards to the denial of tenure in your case." R. 21-5 at 1 (emphasis added). The letter also indicates that following the denial of tenure by the Provost, Monroe requested a hearing of the ERC, and presented his case. The ERC met twice, and eventually sent the previous president a copy of their findings. *Id.* President Kim reviewed those findings and provided a written explanation as to why he did not find them prejudicial. President Kim's conclusion to the letter again indicates that his review was part of Monroe's appeal:

> In the end, the purpose of an *appeal of denial of tenure* is to determine whether the decision was impacted by material, prejudicial deviations from agreed upon process and standards. . . . Knowing the importance of the tenure decision for a faculty member, I have studied your entire case and appeal thoroughly and have considered at length each of the ERC's three findings. In the end, I do not see a compelling basis for suggesting that the outcome in your case was affected in significant degree by any of the instances cited by the ERC, none of which I found to be prejudicial to your case. *I therefore affirm that denial of tenure in your case will stand.*

*Id.* at 3 (emphasis added).

Finally, Defendants attach Columbia's Statement of Policy on Academic Freedom, Faculty Status, Tenure, and Due Process[1] to their dismissal motion, which further supports that the president's decision is merely one of review. In

---

[1] Plaintiff references Columbia's Statement of Policy on Academic Freedom, Faculty Status, Tenure and Due Process at ¶ 44 of his Complaint. Accordingly, Defendants and the Court can rely on this document in evaluating the motion to dismiss. *See 188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002) (a court may consider documents attached to a motion to dismiss if they are referred to in plaintiff's complaint and are central to his claims).

7

pertinent part, the Statement states that the Provost "will decide . . . whether or not to grant the applicant a Tenured Appointment." R. 16-1 at 25. The Statement goes on to say: "The applicant may challenge or seek review of the Provost/Vice President for Academic Affairs' decision solely in accordance with Section XIII." *Id*. Section XIII confirms that "[t]he review process and standards established by this Section XIII will be the exclusive means and bases for a faculty member to challenge or seek review of a determination . . . (4) not to grant him or her a Tenured Appointment." *Id*. at 38. The review process first requires a faculty member to file a written request with the office of the Provost, who then convenes a procedural review committee to review the allegations and obtain advice from legal counsel. The faculty member seeking review has the opportunity to present evidence to aid the committee's review. Once the committee provides a written decision, the decision is delivered to the president. *Id*. at 39. Finally, addressing the president's role in the review process, the Statement provides:

> The affected faculty member will have fifteen Business Days to file written comments on the [Procedural Review Committee]'s decision with the President. Within fifteen Business Days after the faculty member's written comments are received or were due, the President's final written decision as to whether the determination of Nonrenewal, Denial of Tenure, or Termination is affirmed or will be reconsidered in accordance with a process specified in his or her decision will be Delivered to the faculty member. The President's decision is not subject to challenge or review on any basis.

*Id*. at 39. President Kim's letter and Columbia's Statement plainly indicate that the Provost made the final decision to deny tenure, and the president's review was merely the final step in the grievance process. In *Ricks*, the Supreme Court took the

8

operative date to be the date of the decision to deny tenure, not the decision to affirm its denial by a higher authority. Here too, although President Kim may have affirmed the denial, the decision to deny tenure was made by the Provost, and following *Ricks*, that is the operative date.[2]

**B. Equitable Tolling**

Monroe next argues that the operative date should be equitably tolled or estopped because "Columbia led Monroe to reasonably believe that the final decision-maker for faculty employment was no less than the President, and that Monroe relied on that belief." R. 21 at 5. It is well established that the EEOC charge-filing statute is not a jurisdictional prerequisite but rather a statute of limitations which is subject to equitable tolling and estoppel. *Zipes v. Trans World Airlines Inc.,* 455 U.S. 385, 393 (1982). Equitable tolling and equitable estoppel are two different doctrines, with different standards. *See Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 452 (7th Cir. 1990).

Equitable tolling "permits a plaintiff to avoid the bar of the statute of limitations if despite all due diligence he is unable to obtain vital information bearing on the existence of his claim." *Id.* at 451. Equitable tolling "often focuses on

---

[2] Monroe briefly argues that this issue should be decided on summary judgment where a full record could be developed "to permit a more fulsome and searching analysis." R. 21 at 6. But Monroe explicitly alleges that President Kim's decision was part of the grievance process, and President Kim's letter and Columbia's policy confirm that the Provost made the decision. He cannot now back-track his allegations when he learns that the law is not in his favor. If Monroe believes the Provost's decision was not final, and can allege facts in accordance with Fed. R. Civ. P. 11, he is free to amend his Complaint. Taking all reasonable inferences in his favor with the current Complaint, however, his EEOC Charge was untimely.

9

the plaintiff's excusable ignorance of the limitations period and on the lack of prejudice to the defendant." *Wheeldon v. Monon Corp.,* 946 F.2d 533, 536 (7th Cir. 1991). Equitable tolling does not require any conduct by the defendant. *Cada*, 920 F.2d at 452. When determining whether a plaintiff is entitled to equitable tolling, a court must consider whether a reasonable person in the plaintiff's position would have been aware of the possibility of a claim of discrimination. *Hentosh v. Herman M. Finch Univ. of Health Scis./The Chicago Med. Sch.*, 167 F.3d 1170, 1174 (7th Cir. 1999). There is no question that Monroe was aware of the discrimination claim at the time of the Provost's tenure denial—he alleges he filed a complaint of racial discrimination with the Office of Human Resources. R. 1 ¶ 55. Accordingly, Monroe had all the information he needed to make him aware of the possibility of the claim for discrimination, and equitable tolling cannot apply.

Equitable estoppel, on the other hand, requires allegations that Columbia "took active steps to prevent [Monroe] from bringing [his] charge within the allotted time." *See Williamson*, 345 F.3d at 463. These steps must amount to "a deliberate design by the employer or . . . actions that the employer should unmistakably have understood would cause the employee to delay filing his charge." *Hedrich,* 274 F.3d at 1182. Monroe's arguments have been explicitly denied in similar cases by the Seventh Circuit. For example, in *Lever v. Northwestern University*, the plaintiff attempted to pursue claims outside the 300-day limitations period by characterizing the internal review process as a "snare[ ] for the unwary" that kept her from filing with the EEOC in time. 979 F.2d 552, 556 (7th Cir. 1992). The defendant university

offered many channels of internal review through which a professor could attempt to persuade school officials to change their employment decisions. Lever pursued these procedures without success and without filing a charge with the EEOC within the limitations period. The Seventh Circuit rejected Lever's claim that the opportunities for internal review were the type of deception that could support equitable estoppel. *See Lever*, 979 F.2d at 556 ("Excessive kindness in providing many and varied opportunities for internal review is not the sort of deception that supports equitable estoppel."); *see also Lucas v. Chicago Transit Authority*, 367 F.3d 714, 722 (7th Cir. 2004) ("Our decisions clearly demonstrate that merely providing internal review, as in the present situation, is not the type of active step that warrants the application of equitable estoppel."). Likewise, Monroe cannot argue that the mere existence of the grievance review process represents the type of active prevention by the Defendants to toll the limitations period.

### C. Continuing Violation Doctrine

Finally, Monroe argues that the discrimination against him did not end at the denial of tenure and instead continued through the end of his employment in May 2014.[3] He alleges that he was assigned to teach only introductory courses, and specifically excluded from teaching his specialties and courses he was hired to

---

[3] To the extent Monroe argues that his actual employment constituted discrimination, the Supreme Court rejected that argument decades ago. *Delaware State Coll. v. Ricks,* 449 U.S. 250, 257 (1980) ("Mere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination.").

teach. R. 1 ¶ 50. As a result, Monroe states that the last act of discrimination was not the denial of the tenure position.

The continuing violation theory is an exception to the 300-day rule where time-barred acts may be linked to acts within the limitations period under certain circumstances. *Holmes v. Hous. Auth. of Joliet*, 2014 WL 6564949, at *4 (N.D. Ill. Nov. 20, 2014). In *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), the Supreme Court explained when a plaintiff may rely on the continuing violation doctrine to recover for discriminatory acts that fall outside the 300-day limitations period. The doctrine operates differently according to the type of discriminatory act alleged—"discrete" discriminatory acts are treated differently than acts contributing to a hostile work environment. *Morgan*, 536 U.S. at 114-15.

1. **Discrete Acts**

With respect to the first category—"discrete" acts—each act "starts a new clock for filing charges," and the clock starts on the date that the act "occurred." *Id.* at 113. Any discrete discriminatory acts that fall outside the statute of limitations are time-barred even though they may relate to other discrete acts that fall within the statute of limitations. *See id.* at 112 ([D]iscrete acts that fall within the statutory time period do not make timely acts that fall outside the time period."). The denial of tenure is a discrete act. *See id.* at 114 (Discrete acts include "termination, failure to promote, denial of transfer, or refusal to hire," and "are easy to identify" because "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment
12

practice.'"). Accordingly, Monroe's denial of tenure claim cannot be saved by the continuing violation doctrine and is barred by the 300-day limitation. His denial of tenure, however, may still be used as evidence in support of his timely claims. *See Gul-E-Rana Mirza v. The Neiman Marcus Grp., Inc.*, 649 F. Supp. 2d 837, 852 (N.D. Ill. 2009).

Monroe also hints that Sheridan's decision that Monroe would teach only introductory courses was a form of discrimination that continued through the end of his employment. Defendants argue that a reduction in course assignments is not an adverse employment action sufficient to sustain Monroe's Title VII claims.[4] Adverse employment action has been defined broadly in the Seventh Circuit. *See Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996). "[A]dverse job action is not limited solely to loss or reduction of pay or monetary benefits. It can encompass other forms of adversity as well." *Collins v. State of Illinois*, 830 F.2d 692, 703 (7th Cir. 1987) (citation omitted). However, "not everything that makes an employee

---

[4] Both Counts I and II require Monroe to allege that he suffered an adverse employment action. To establish a *prima facie* case for race discrimination (Count I), Monroe must allege that he belongs to a protected class, that he was performing his job at Columbia to his employer's satisfaction, that he suffered an adverse employment action, and that a similarly-situated employee who was not a member of a protected class was treated more favorably. *Stalter v. Wal–Mart Stores, Inc.*, 195 F.3d 285, 289 (7th Cir. 1999). The *prima facie* case for a retaliation claim (Count II) requires Monroe to allege "that (1) after lodging a complaint about discrimination, (2) only he, and not any otherwise similarly situated employee who did not complain, was (3) subjected to an adverse employment action even though (4) he was performing his job in a satisfactory manner." *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 642 (7th Cir. 2002). The definition of adverse action in retaliation cases is broader than the definition for adverse actions in discrimination cases. *Whittaker v. N. Illinois Univ.*, 424 F.3d 640, 648 (7th Cir. 2005).

13

unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that 'an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.'" *Smart*, 89 F.3d at 441 (citations omitted). Adverse employment actions typically fall into one of three categories: "(1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge." *Barton v. Zimmer, Inc.*, 662 F.3d 448, 454-454 (7th Cir. 2011). Monroe alleges that he was forced to teach classes below his specialty and below the type of courses he was hired to teach. Making all inferences in his favor, these allegations plausibly suggest that Monroe suffered an adverse employment decision that resulted in a reduction in benefits, reduced his future career prospects, or created an unbearable change in job conditions.[5]

---

[5] Defendants cite two cases to support their position that a change in the courses taught does not represent an adverse employment decision, *Spring v. Sheboygan Area School District*, 865 F. 2d 883 (7th Cir. 1989) and *Flaherty v. Gas Research Institute*, 31 F.3d 451 (7th Cir. 1994). Neither resembled the circumstances here. *Sheboygan* involved a transfer between schools, while *Flaherty* involved a transfer in department. Further, both cases were decided on summary judgment after evidence was presented that the employment decision was not actually adverse. In *Sheboygan*, the plaintiff received a two-year contract, a merit-pay increase, and admitted that the new position was not a lesser job than her previous role. *Sheboygan*, 865 F.2d at 886. In *Flaherty*, the department change was not accompanied with any change in salary, benefits, or level of responsibility. *Flaherty*, 31 F.3d at 457. Here, however, Monroe explicitly alleges a change in responsibility and the potential for adverse effects on his future job prospects. R. 1 ¶¶ 50, 52, 61.

The problem with Monroe's argument, however, is not whether the change in courses was an adverse employment action. Monroe alleges Sheridan's decision was made in 2011. R. 1 ¶ 50. This is well outside the 300-day limitations period allowed by Title VII. Even if Sheridan discriminated against Monroe each semester by assigning him to only introductory courses (which Monroe does not allege), each assignment would constitute a discrete act, and only those decisions that fall within the 300-day period would survive. But because Monroe fails to allege any discrete act within the 300-day period, his Title VII claim must be dismissed.

**2. Hostile Work Environment**

The only way Monroe's Title VII claim can survive is if he alleged a hostile work environment with at least one act falling within the 300-day period. Hostile work environment acts involve "repeated conduct" that "may not be actionable on its own." *Morgan*, 536 U.S. at 115. Rather, "[s]uch claims are based on the cumulative effect of individual acts." *Id*. In contrast to discrete acts of discrimination, it does not matter that "some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id*. at 117; *see also Lucas*, 367 F.3d at 724.

But Monroe has not explicitly alleged discrimination in the form of a hostile work environment. He has only alleged discrimination through differing terms and conditions of employment because of his race. *See* R. 1 ¶¶ 67, 71. Nor do the

15

allegations of the Complaint plausibly allege a hostile work environment. A hostile environment is one that is "permeated with discriminatory intimidation, ridicule and insult." *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 426 (7th Cir. 2004). To state a Title VII hostile work environment claim, Monroe must allege (1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was severe or pervasive so as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is basis for employer liability. *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.*, 804 F.3d 826, 833-34 (7th Cir. 2015). "To rise to the level of a hostile work environment, conduct must be sufficiently severe or persuasive to alter the conditions of employment such that it creates an *abusive* relationship." *Id.* (emphasis in original). In determining whether a workplace is objectively hostile, courts consider the totality of the circumstances, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Alamo v. Bliss*, 864 F.3d 541, 549–50 (7th Cir. 2017)

Monroe alleges that Sheridan demoted him to teaching only introductory classes, "hyper-surveilled" Monroe's activities, and made false accusations of Monroe. (R. 1 ¶¶ 50, 51). He does not allege that Sheridan's actions created an abusive relationship, nor do his allegations reflect the types of situations the Seventh Circuit has held to be plausible allegations of a hostile work environment. *Cf. Huri*, 804 F.3d at 834 (allegations of screaming, prayer circles, social shunning,

implicit criticism of non-Christians, and uniquely bad treatment plausibly alleged a hostile work environment); *Alamo*, 864 F.3d at 550-552 (allegations that coworkers used offensive slurs, stole plaintiff's food, and physically threatened him over a two-year period, as well as allegations that he routinely complained to his supervisors of mistreatment and that those supervisors did nothing to curb the ongoing harassment were sufficient to survive motion to dismiss). Monroe has failed to allege a continuing violation. Monroe's Title VII claim is dismissed.

## II. 42 U.S.C. § 1981 (Count III)

Lawsuits alleging violations of Section 1981 must be filed within four years of the alleged violation. *See* 28 U.S.C. §1658(a); *Jones v. R.R. Donnelley & Sons*, 541 U.S. 369, 383 (2004). EEOC proceedings do not toll the statute of limitations for Section 1981 claims. *Juarez v. Ameritech Mobile Commc'ns, Inc.*, 957 F.2d 317, 322 (7th Cir. 1992). Like their arguments under the Title VII claims, Defendants argue that the denial of Monroe's tenure occurred on March 18, 2013, and as a result, his August 2017 filing of this Complaint is barred by the four-year statute. But Monroe alleges more in his Section 1981 claim than simply the denial of tenure. Specifically, he alleges:

> Columbia and Sheridan deprived Monroe of his rights granted by 42 U.S.C. § 1981 to "make and enforce contracts" when they deliberately and intentionally discriminated against him based upon his race by discrediting and demeaning his activities as a professor, refusing to assign him administrative responsibilities, refusing to assign him advanced courses, refusing to provide peer reviews of his courses, engaging in hyper-surveillance of his activities, selectively "cherry picking" negative student comments, overruling the determination of his Department peers on his tenure application and rejecting the evidence, both actual and scholarly, of bias in student evaluations.

17

R. 1 ¶ 77. None of these actions, however, are alleged to have occurred within the four-year period preceding the filing of Monroe's Complaint. *See* R. 1 ¶¶ 25, 31, 50, 51 (all alleged to have taken place before 2012). And, for the reasons outlined above, neither the equitable tolling nor continuing violation doctrines can save Monroe's claim. *See Dandy v. United Parcel Serv., Inc.,* 388 F.3d 263, 270 (7th Cir. 2004) (continuing violation doctrine applies to Title VII as well as Section 1981); *Humphries v. CBOCS West, Inc.,* 474 F.3d 387, 403-04 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008) (noting that the standards and methods of proof for racial discrimination claims under Title VII and Section 1981 are the same). Monroe's Section 1981 claim is untimely.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss Counts I, II, and III, R. 14, is granted without prejudice. If Plaintiff believes he can cure the deficiencies identified in this opinion, he may file a motion for leave to file an amended complaint on or before May 1, 2018. The motion should attach a redlined comparison between the current complaint and the proposed amended complaint, and it should be supported by a brief of no more than five pages describing how the proposed amended complaint cures the deficiencies in the current complaint.

ENTERED:

_Thomas M Durkin_
_____

Dated: April 10, 2018

Honorable Thomas M. Durkin
United States District Judge