# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

VAUN MONROE,                                )
                                            )
    Plaintiff,                            )
                                            )
v.                                          )    No. 17-cv-5837
                                            )
COLUMBIA COLLEGE OF CHICAGO &               )    Judge Thomas M. Durkin
BRUCE SHERIDAN,                             )
                                            )
    Defendants.                           )

## MEMORANDUM OPINION AND ORDER

Plaintiff Vaun Monroe brought this action against Defendants Columbia College of Chicago and Bruce Sheridan asserting claims of race discrimination and retaliation in violation of Title VII (Counts I and II), 42 U.S.C. § 1981 (Count III), and Title VI (Count IV); as well as intentional interference with contract and prospective economic advantage (Counts V and VI). The Court previously granted a motion to dismiss by Defendants, holding that Counts I through III were time-barred. R. 43. Monroe subsequently filed an amended complaint. R. 50. Defendants have moved to dismiss Counts I through III of the Amended Complaint, arguing Monroe still has not pleaded that his claims were timely filed. R. 52. For the following reasons, Defendants' motion is granted.

## LEGAL STANDARD

A Rule 12(b)(6) motion challenges the "sufficiency of the complaint." *Berger v. Nat. Collegiate Athletic Assoc.*, 843 F.3d 285, 289 (7th Cir. 2016). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled

to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 366 (7th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Tobey v. Chibucos*, 890 F.3d 634, 646 (7th Cir. 2018).

## BACKGROUND

Monroe was formerly a tenure-track assistant professor at Columbia in the Film and Video Department. He alleges that he was the first and only black male hired as a tenure-track professor in that department. R. 50 ¶ 2. Monroe alleges a history of discrimination beginning from his first year at Columbia. He notes that his concerns about bias in his students' evaluations were ignored, and he was passed up for promotions over white, less qualified individuals.

In late 2010, Sheridan, Monroe's department chair, recommended Monroe's termination. *Id.* ¶ 40. Monroe filed a grievance with the Elected Representatives of the College ("ERC") and Sheridan's recommendation was eventually reversed by Columbia's then president, President Carter. *Id.* ¶¶ 44-49. In reversing the proposed dismissal, President Carter wrote: "My decision regarding your faculty status at Columbia College Chicago is that your tenure-track appointment be continued for the 2011-2012 academic year." *Id.* ¶ 49. The grievance allegedly resulted in retaliation by Sheridan—Sheridan removed Monroe from teaching advanced and specialty courses to teaching only foundational courses. *Id.* ¶ 50. Monroe resumed teaching advanced courses at least in his final year of employment with Columbia. *Id.*

Sheridan also "engaged in hyper-surveillance" of Monroe's activities and threatened Monroe with "investigations" of minor infractions that never actually materialized. *Id.* ¶ 51. Monroe alleges this behavior continued until the end of his employment. *Id.* ¶¶ 50, 51.

Eventually, when Monroe was considered for tenure, his department "voted overwhelmingly in favor of Monroe's tenure," but Sheridan issued a negative recommendation. *Id.* ¶ 53. On March 18, 2013, the Provost denied Monroe tenure because he "did not show strong evidence of excellence in teaching or professional distinction in creative endeavors or scholarship." *Id.* ¶ 54. Monroe filed a grievance with the ERC and also filed a complaint of racial discrimination, harassment, and retaliation against Sheridan with Columbia's Office of Human Resources. *Id.* ¶ 55-56. Both complaints were rejected. *Id.* Monroe then submitted materials for review of

the decision to Columbia's incoming president, President Kim. President Kim ruled against Monroe on August 12, 2013. *Id*. ¶ 59. Monroe alleges that based on his previous experiences with Columbia, it is the president's decision to retain or dismiss a professor, and as a result, Monroe believed President Kim made the final decision on tenure, and that earlier decisions by the Provost were merely recommendations. *Id*. ¶ 60.

Monroe contested President Kim's decision. He first wrote to the American Association of University Professors. *Id*. ¶ 61. The Association wrote to President Kim, stating that the decision to deny Monroe tenure after he had made a claim for discrimination was grounds for a new hearing and that Columbia was in violation of best academic practices. *Id*. President Kim responded that Columbia would treat the statement as a "suggestion" and would consider it for future cases. *Id*. On September 12, 2013, about one month after President Kim's decision to deny Monroe tenure, Monroe filed a complaint of discrimination with the City of Chicago Commission on Human Relations, alleging racial discrimination and workplace retaliation. *Id*. ¶ 62. Monroe next filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on February 7, 2014. *See* R. 50-1. The EEOC issued an inconclusive determination on May 12, 2017. *Id*. The EEOC did not indicate the Charge was untimely filed. *Id*. Monroe filed this action on August 10, 2017.

## DISCUSSION

On April 10, 2018, the Court dismissed Counts I through III of Monroe's complaint as time-barred. R. 43. The Court assumes general familiarity with that

4

decision. In that opinion, the Court held that the Provost's decision on March 18, 2013 denying Monroe tenure, not President Kim's decision, was the operative adverse action for determining the statute of limitations period. The Court based that ruling on Seventh Circuit precedent, Columbia's policies on tenure, and the letters referenced in the complaint in which President Kim stated his decision was solely appellate. R. 43 at 5-9. Because the Court determined the operative adverse action date was March 18, 2013, Monroe's February 7, 2014 complaint with the EEOC was filed 26 days beyond the 300-day limitations period under 42 U.S.C. § 2000e–5(e)(1). The Court also found that Monroe had not plausibly alleged that discrimination against him continued through the end of his employment in May 2014 after he had filed his EEOC complaint, and Monroe had not demonstrated that equitable principles should toll the limitations period. For similar reasons, the Court found Monroe had failed to timely bring his 42 U.S.C. § 1981 claim, which has a four-year statute of limitations period.

Monroe now argues his Title VII and Section 1981 claims are timely because the discrimination against him continued through the termination of his employment and because Defendants should be equitably estopped from arguing the statute of limitations applies.

## I. Title VII Claim (Counts I and II)

### A. Adverse Employment Action

Monroe first argues that the amended complaint sufficiently alleges that he suffered specific acts of discrimination through the date of his termination in May

5

2014. To be actionable, a discriminatory act must constitute an "adverse employment action." *Stalter v. Wal–Mart Stores, Inc.,* 195 F.3d 285, 289 (7th Cir. 1999). An adverse employment action is one that results in a "significant change in employment status." *Chaudhry v. Nucor Steel-Ind.*, 546 F.3d 832, 838 (7th Cir. 2008). "[N]ot everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that 'an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.'" *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996). Adverse employment actions typically fall into one of three categories: "(1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge." *Barton v. Zimmer, Inc.*, 662 F.3d 448, 454-454 (7th Cir. 2011).

Here, Monroe alleges he was subjected to different terms and conditions of employment because of his race and in retaliation for his complaints against Sheridan. He argues that this conduct falls into the second category of adverse employment actions—changes in job duties that cause an employee's skills to atrophy or reduce future career prospects. R. 55 at 5. Most of Monroe's allegations occurred well outside the 300-day limitations period required to bring his Title VII claim and thus cannot be included as timely discrete acts. *See* R. 50 ¶¶ 50, 51.

6

Monroe makes conclusory allegations that some of the conduct continued through the end of his employment—his amended allegations extend the relevant dates of the conduct through May 2014 ("post-tenure decision conduct"). Specifically, he alleges that he was forced to teach only introductory classes, "including during his 'terminal year' at Columbia in the fall 2013 and continuing in the Spring semester through May 2014." *Id.* ¶ 50. Monroe further alleges that Sheridan's "hyper-surveillance" of Monroe's activities continued through May 2014. *Id.* ¶ 51. Neither of these allegations plausibly allege an adverse employment action. With respect to both allegations, Monroe's own complaint shows they had no effect on his tenure decision. As to his teaching introductory courses, Monroe alleges that in his "terminal year" he taught two advanced courses, but these courses were too late to benefit his tenure application. *Id.* ¶ 50. Likewise, he alleges the hyper-surveillance was reduced during his terminal year and that Sheridan's threats of investigations never actually materialized. *Id.* ¶ 51. Nor does Monroe allege that his skills atrophied or that his future career prospects were reduced because of that later conduct. *Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 731 (7th Cir. 2004) ("There must be some tangible job consequence accompanying the reprimand to rise to the level of a material adverse employment action.").

In any event, the conduct he complains of does not constitute adverse employment actions. Monroe argues the changes in his job duties (restriction to teaching introductory classes, failing to allow peer reviews of his classes, denying interactions with community groups, denigrating his work to others) is sufficient to

7

meet the adverse employment action standard. But courts have held that similar conduct is not actionable, particularly without allegations that the change had any job consequences. *See Peters v. Wal-Mart*, 876 F. Supp. 2d 1025, 1035 (N.D. Ind. 2012), *aff'd sub nom. Peters v. Wal-Mart Stores E., LP*, 512 F. App'x 622 (7th Cir. 2013) (allegations that defendants would not allow plaintiff to modify her schedule, reprimanded her rudely, failed to train her on certain equipment, required her to take a drug test, kept plaintiff under "close surveillance," gave her a written coaching, and gave her difficult work assignments were insufficient to establish an adverse employment action as a matter of law); *Lapka v. Chertoff,* 517 F.3d 974, 986 (7th Cir.2008) (concluding that more difficult or time-consuming work assignments and decreased performance ratings were not materially adverse employment actions absent tangible job consequences); *compare Alexander v. Casino Queen*, 739 F.3d 972, 980 (7th Cir. 2014) (allegations that plaintiffs were moved from high-tipping areas on the casino floor and disciplined more harshly than their white peers causing them to lose hours or days of tips were sufficient because tips comprised 40% to 73% of the plaintiffs' compensation and as a result, the reduction represented a "significant" change in benefits); *Lewis v. City of Chicago*, 496 F.3d 645, 653 (7th Cir. 2007) (denial of training experience through denial of overtime could constitute adverse employment action because plaintiff lost overtime pay and because it denied her the opportunity to police large public gatherings to advance her career and receive future

overtime).[1] In its previous opinion, the Court explained that Monroe plausibly alleged an adverse employment action based on allegations that he was forced to teach classes outside his specialty, which plausibly could have constituted a reduction in benefits, a reduction in future career prospects, or created an unbearable change in job conditions. R. 43 at 14. But in his Amended Complaint, Monroe pleads himself out of plausibility by admitting he did teach advanced courses, and that teaching some introductory courses in his terminal year did *not* affect his tenure prospects. R. 50 ¶ 50. Without allegations that the employment action had tangible job consequences, Monroe does not plausibly allege an actionable adverse employment action.

Here, the only detriment Monroe alleges is the denial of tenure. But the actions that led to that denial necessarily occurred before he was denied tenure. Monroe fails to allege any post-tenure decision conduct that had an adverse effect on his career prospects. Accordingly, Monroe fails to plead any discrete adverse actions within the limitations period.

### B. Hostile Work Environment

---

[1] Monroe criticizes Defendants for using cases decided on summary judgment in support of their argument, but Monroe likewise uses summary judgment decisions in support of his argument. *See* R. 55 at 6. On a motion to dismiss, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Tobey v. Chibucos*, 890 F.3d 634, 646 (7th Cir. 2018). The courts in the cases on which both parties and the Court rely, found that the plaintiffs could not show an adverse employment action as a matter of law and therefore are properly considered on a motion to dismiss.

Monroe's Title VII claim can survive if he alleges a hostile work environment with at least one act falling within the 300-day period. Monroe fails to do so. Hostile work environment claims involve "repeated conduct" that "may not be actionable on its own." *Morgan*, 536 U.S. at 115. Rather, "[s]uch claims are based on the cumulative effect of individual acts." *Id*. In contrast to discrete acts of discrimination, it does not matter that "some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id*. at 117; *see also Lucas*, 367 F.3d at 724.

A hostile environment is one that is "permeated with discriminatory intimidation, ridicule and insult." *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 426 (7th Cir. 2004). To state a Title VII hostile work environment claim, Monroe must allege (1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was severe or pervasive so as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is basis for employer liability. *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.*, 804 F.3d 826, 833-34 (7th Cir. 2015). "To rise to the level of a hostile work environment, conduct must be sufficiently severe or persuasive to alter the conditions of employment such that it creates an *abusive* relationship." *Id*. (emphasis in original). In determining whether a workplace is objectively hostile, courts consider the totality of the circumstances, including: "the frequency of the discriminatory

conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Alamo v. Bliss*, 864 F.3d 541, 549-50 (7th Cir. 2017)

Monroe's allegations do not plausibly support an abusive work environment. Monroe alleges he was denied the opportunity to teach advanced courses, serve in coordinator positions, hold administrative responsibilities, interact with community groups, and to have his teaching assessed by peer reviews. R. 50 ¶ 67. Monroe also alleges he was subject to hyper-surveillance and threatened with "investigations" of minor infractions, but that those investigations never actually materialized. *Id*. Although these incidents may have understandably frustrated Monroe, they do not constitute harassment so severe or pervasive to alter the conditions of employment and create an *abusive* working environment. *Compare Huri*, 804 F.3d at 834 (allegations of screaming, prayer circles, social shunning, implicit criticism of non-Christians, and uniquely bad treatment plausibly alleged a hostile work environment); *Alamo*, 864 F.3d at 550-552 (allegations that coworkers used offensive slurs, stole plaintiff's food, and physically threatened him over a two-year period, as well as allegations that he routinely complained to his supervisors of mistreatment and that those supervisors did nothing to curb the ongoing harassment were sufficient to survive motion to dismiss). Further, Monroe does not allege that the conduct interfered with his work performance. *See Alexander*, 739 F.3d at 982 (work environment that "was not physically threatening, nor was it openly racist, nor did it unreasonably interfere with plaintiffs' performance" was not a hostile work

11

environment). Instead, Monroe's allegations indicate his performance was not affected—he alleges Sheridan selectively quoted negative student evaluations while ignoring "overall statistics and peer reviews that were positive," R. 50 ¶ 51, and falsely denigrated Monroe to professional colleagues, *id.* ¶ 52. Monroe has not plausibly alleged a hostile work environment that interfered with his work performance. *See Griffin v. Potter,* 356 F.3d 824, 830 (7th Cir. 2004) (noting that a supervisor's alleged harassing conduct did not interfere with plaintiff's ability to do her job and therefore weighed against a finding of a hostile work environment).

**C. Equitable Estoppel**

Monroe next argues that the Court should apply equitable estoppel to allow his claims to proceed because he timely asserted his rights, but mistakenly in the wrong forum. R. 55 at 10. Monroe alleges he filed a complaint of discrimination with the City of Chicago Commission on Human Relations alleging racial discrimination and workplace retaliation within the 300-day limitations period. R. 50 ¶ 62. Monroe concedes that his filing of that complaint is not sufficient to meet the limitations period because the Commission is not a federally certified agency. *See* R. 55 at 11. Nonetheless, he contends that Columbia is equitably estopped from arguing that his subsequent filing with the EEOC was filed too late.

Simply mistaking the proper forum is not sufficient to warrant equitable estoppel. As a case Monroe cites makes clear, extending the statute of limitations is appropriate where the defendant "by deceptive conduct, caused the plaintiff's untimeliness." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1390 (3d

12

Cir. 1994).[2] Indeed, equitable estoppel requires allegations that Columbia "took active steps to prevent [Monroe] from bringing [his] charge within the allotted time." *See Williamson v. Indiana Univ.,* 345 F.3d 459, 463 (7th Cir. 2003); *Hentosh v. Herman M. Finch Univ. of Health Scis./The Chicago Med. Sch.*, 167 F.3d 1170, 1174 (7th Cir. 1999). Monroe makes no allegations that Columbia took active steps to cause him to bring the case before the Commission on Human Rights rather than the EEOC.[3]

Monroe instead argues Columbia lulled him into believing that the president was the final decision-maker as to tenure. As the Court explained in its first opinion, allegations of equitable estoppel require "a deliberate design by the employer or . . . actions that the employer should unmistakably have understood would cause the employee to delay filing his charge." *Hedrich v. Bd. of Regents of Univ. of Wisconsin Sys.*, 274 F.3d 1174, 1182 (7th Cir. 2001). Monroe makes no such allegations. Instead, the "lulling" Monroe alleges occurred years before the tenure decision: Monroe alleges

---

[2] The other case Monroe cites for his argument is not on point. *See Burnett v. New York Cent. R. Co.,* 380 U.S. 424, 429-34 (1965) (respondent could not rely on limitations statute because it knew that the petitioner was actively pursuing his rights in the state court and becuase to not toll the statute would create a "procedural anomaly" regarding improper venue not intended by the Federal Employers' Liability Act).

[3] To the extent Monroe argues equitable tolling is more appropriate, that argument fails because there are no allegations Monroe "discovered" his injury at a later date. *See Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990) (Equitable tolling "permits a plaintiff to avoid the bar of the statute of limitations if despite all due diligence he is unable to obtain vital information bearing on the existence of his claim."). Here, Monroe was aware of the discrimination claim at the time of the Provost's tenure denial. He alleges he filed a complaint of racial discrimination with the Office of Human Resources soon after he was denied tenure. R. 50 ¶ 56.

President Carter reversed a recommendation to terminate his employment for the *2011-2012 academic year*. R. 50 ¶ 49. If Monroe is arguing that this decision caused him to believe President Kim's denial was the final decision, this at most indicates confusion by Monroe as to Columbia's procedures on tenure—not a "deliberate design" by Columbia to delay Monroe filing his Charge of Discrimination three years later. Regardless, President Kim's letter to Monroe in August 2013 clarified those procedures. *See* R. 43 at 7 (noting that President Kim's letter on August 12, 2013 stated: "my office received your written *appeal* in regards to the denial of tenure in your case," and after describing the procedures Monroe had already attempted, stating "[k]nowing the importance of the tenure decision for a faculty member, I have studied your entire case and *appeal* thoroughly and have considered at length each of the ERC's three findings. In the end, . . . *I therefore affirm that denial of tenure in your case will stand.*") (emphasis added in original opinion).[4]

Further, Seventh Circuit case law forecloses any argument by Monroe that having many channels of internal review constitutes active steps by an employer warranting equitable estoppel. *See Lever v. Northwestern University*, 979 F.2d 552, 556 (7th Cir. 1992) (an internal review process was not a "snare[ ] for the unwary" simply because the defendant university offered many channels of internal review through which a professor could attempt to persuade school officials to change their employment decisions); *see also Lucas*, 367 F.3d at 722 ("Our decisions clearly

---

[4] Monroe attached President Kim's letter to his response to Defendants' initial motion to dismiss. *See* R. 21-5. The Court relied on that letter in its opinion.

14

demonstrate that merely providing internal review, as in the present situation, is not the type of active step that warrants the application of equitable estoppel.").

In sum, Monroe fails to allege any deliberate action by Columbia warranting equitable estoppel. As explained in the Court's previous order, it is clear from Columbia's policies and the letter President Kim sent to Monroe that his decision on tenure was merely one of appellate review. R. 43 at 7-8. Monroe does not plausibly allege that he was deceived into his untimely filing. Monroe's Title VII claims are therefore dismissed with prejudice.[5]

## II.  42 U.S.C. § 1981 (Count III)

For the same reasons as explained above and in the Court's previous order (R. 43 at 17-18), Monroe's Section 1981 claim is also untimely. Lawsuits alleging violations of Section 1981 must be filed within four years of the alleged violation. *See* 28 U.S.C. §1658(a). Monroe was denied tenure on March 18, 2013. He filed this action on August 10, 2017. His claim is thus barred by the four-year statute. Monroe's Section 1981 claim is dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss Counts I through III, R. 52, is granted.

---

[5] Despite an opportunity to amend his claim, Monroe has failed to plead a plausible claim for relief. A court need not grant leave to amend if it is clear that amendment is futile. *See Runnion v. Girl Scouts of Greater Chicago & Nw. Ind.,* 768 F.3d 510, 520 (7th Cir. 2015).

15

ENTERED:

Dated: August 27, 2018

*Thomas M Durkin*
-----------------------------------------
Honorable Thomas M. Durkin
United States District Judge