UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

VAUN MONROE,

    Plaintiff,

v.

COLUMBIA COLLEGE CHICAGO and
BRUCE SHERIDAN,

    Defendants.

No. 17 C 5837

Judge Thomas M. Durkin

**MEMORANDUM OPINION AND ORDER**

Plaintiff Vaun Monroe brought this action against Defendants Columbia College Chicago and Bruce Sheridan asserting claims of race discrimination and retaliation in violation of Title VII (Counts I and II), 42 U.S.C. § 1981 (Count III), and Title VI (Count IV); as well as intentional interference with contract and prospective economic advantage (Counts V and VI). The Court previously dismissed Counts I-III as time-barred. *See* R. 62. Now before the Court is Defendants' motion for summary judgment on Counts IV-VI [R. 73]. Defendants' motion is granted.

**Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). To

1

defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**Background**

Plaintiff Vaun Monroe began working at Columbia College Chicago in the fall of 2007. R. 75 ¶ 3. He was the first African-American male hired as a tenure-track professor in Columbia's Film & Video Department. R. 92 ¶ 2.

Columbia's tenure process involves several steps.[1] First, external reviewers review the candidate's curriculum vitae and his other scholarly and creative endeavors. They submit their evaluations to the candidate's Department Chair, who reviews the candidate's tenure dossier and prepares a Department Chair Report. Other department faculty independently review the dossier and prepare a Reviewing Faculty Report. The candidate's dossier and the Department Chair and Reviewing

---

[1] Monroe "denies" that Columbia's Statement of Policy on Academic Freedom, Faculty Status, Tenure, and Due Process attached to the Defendants' summary judgment motion governs his tenure process because the handbook was amended on May 9, 2013, which was subsequent to his review. But the handbook also states it was amended in 2002, 2003, 2009, 2011, and 2012. And Monroe does not point to a single provision that was amended in 2013. Tellingly, in opposing the Defendants' motion to dismiss, Monroe cited the same handbook as containing the dispositive language. *See* R. 21 at 7. In the absence of any evidence that the handbook was amended in 2013 in a way that materially affects this dispute, the Court refers to it as governing here.

2

Faculty Reports are sent to the School Dean, who in turn writes a School Dean Report. At that point, the candidate may submit comments to the All College Tenure Committee, which generates yet another report and delivers it to Columbia's Provost/Vice President for Academic Affairs. The Provost/Vice President then makes the final tenure decision. *See* R. 75 Ex. B at 15-18.

Monroe received several negative student course evaluations during his first year at Columbia. Monroe met with Department Chair Bruce Sheridan to discuss the evaluations and pointed out that student evaluations may result in bias against faculty of color. Monroe claims that Sheridan then accused him of "playing the race card" and not "assuming responsibility for [his] classroom." R. 92 ¶ 9. During Monroe's second year, a student created a racially-charged website about him, which Monroe contends department personnel told him to ignore. R. 87 Ex. E ¶ 14.

By Monroe's third year, Columbia instituted a third-year review for tenure-track faculty. *Id.* ¶ 17. The review was intended to provide the faculty member with an assessment of his performance, but also to result in a recommendation of "continuation" or "termination" based on the results. R. 50 ¶ 33. Sheridan attended Monroe's faculty review despite conversations about whether a department chair's presence at the meeting was appropriate. R. 92 ¶ 15. During the meeting, Sheridan again raised the issue of student evaluations and Monroe repeated his concern about potential bias. *Id.* at ¶ 16. The faculty members then voted on the three areas measured for tenure: Teaching and Curriculum Development; Creative or Scholarly Work; and College and Community Service. Monroe received zero yes votes in

3

Teaching and Curriculum Development. R. 87 ¶ 15. He received 16 yes votes and one no vote in Creative or Scholarly Work, and 9 yes votes and 8 no votes in College and Community Service. R. 75 Ex. D at 6. Sheridan and School of Media Arts Dean Doreen Bartoni subsequently prepared the Department Chair and School Dean Reports, both of which raised concerns about Monroe's teaching and teaching-related activities. *See id.* Ex. E at 2-3; Ex. F. After reviewing Monroe's three-year tenure dossier and the Reviewing Faculty, Department Chair, and School Dean Reports, Vice President for Academic Affairs Louise Love declined to renew Monroe's appointment for the following year. *Id.* Ex. G at 1.

When Monroe learned of Love's decision, he filed a grievance with Columbia's Elected Representative Committee. R. 87 Ex. E ¶ 23. The Committee determined that the Film & Video Department did not follow its stated procedures for evaluating Monroe's teaching, specifically noting the prejudicial effect of not having tenured faculty perform classroom observations. R. 92 ¶ 19. Columbia President Warrick Carter subsequently reversed the decision not to renew Monroe's contract for 2011-2012. R. 87 Ex. J.

Following Carter's reversal, Monroe met with Sheridan to clear the air. During the meeting, Sheridan accused Monroe of tardy submissions of administrative materials. R. 92 ¶ 20(a). Thereafter, Sheridan only assigned Monroe to teach introductory courses for the rest of his employment at Columbia. *Id.* ¶ 22; R. 87 Ex. E at 16. While Monroe had received his best evaluations in graduate-level directing courses, a white male with a bachelor's degree in marketing was hired as an adjunct

4

professor in 2011 and taught Directing 1 every semester through the fall of 2014. R. 92 ¶ 22. Meanwhile, Sheridan chose white non-tenure track senior lecturers over Monroe to fill several screenwriting and program coordinator positions. *Id.* ¶ 12. Monroe contends that all of his white peers held coordinator positions in the department. *Id.* ¶ 11.

Monroe's official review for tenure appointment began in 2012. The reviewing department faculty met without Sheridan present and approved Monroe's tenure application by a vote of 9-5. *Id.* ¶¶ 23-24. While their report cited continuing evidence of Monroe failing to provide timely feedback to students and respond to student communication, it stated that Monroe had "significantly improved in the area of teaching and teaching-related activities." R. 75 Ex. I at 3.

Meanwhile, Sheridan wrote an eight-page Department Chair Report (which Monroe contends is far longer than is customary), in which he noted improvements in Monroe's course evaluations. R. 75 Ex. J at 1. Nevertheless, Sheridan stated that "there remain significant concerns related to reliability, punctuality, and the discharge of contracted full-time duties such as student advising, and thoroughness in teaching methodology." *Id.* at 8. The Report cited examples of Monroe failing to appear for student meetings, providing late student feedback, and neglecting other administrative responsibilities. *See id.* 4-5. The Report also included an excerpt from a negative student evaluation in a course in which the comments were overwhelmingly positive. R. 92 ¶ 28. Ultimately, Sheridan concluded that Monroe's

performance in the area of "Teaching and Teaching-Related Activity" fell below the standard required for tenure. R. 75 Ex. J at 8.

The All College Tenure Committee voted unanimously to deny Monroe tenure. *Id.* Ex. K at 1. The Committee noted that Monroe's "efforts have consistently fallen short of both the department's and the college's standards" and that "two of his three reviewers did not endorse his tenure bid." *Id.* In a March 18, 2013 letter, Vice President Love informed Monroe that "after reviewing your tenure dossier and recommendations of three external reviewers, the tenured members of the Film & Video Department, Chair Bruce Sheridan, Dean Robin Bargar, and the All-College Tenure Committee, I have decided that Columbia College Chicago will not grant you tenure." *Id.* Ex. L. The language in Love's letter closely followed the language in Sheridan's report. R. 92 ¶ 39.

Monroe contends that Sheridan's Department Chair Report contained numerous misrepresentations. R. 87 Ex. E ¶¶ 36-43. Monroe also claims that missing student-advising sessions and submitting forms late were common occurrences in the department. R. 92 ¶¶ 34-35. Monroe further contends that Sheridan denied him the opportunity to teach interdisciplinary courses that would have helped his tenure application. *Id.* ¶ 37. Monroe points to affidavits from a former African-American tenure-track professor in the department and a former African-American student as evidence of an ongoing pattern of discrimination involving Sheridan. *See* R. 87 Exs. O, P.

6

Defendants now move for summary judgment on Monroe's claims under Title VI (Count IV) and for intentional interference with contract (Count V) and prospective economic advantage (Count VI).[2]

## Analysis

### I. Title VI (Count IV)

Title VI provides that "[n]o person in the United States, shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

The parties disagree whether a five-year or two-year statute of limitations applies to claims under Title VI. Monroe's employment with Columbia ended in May 2014. He filed this lawsuit in August 2017. Accordingly, even assuming Monroe could state a cognizable Title VI claim through the last day of his employment, his claim is barred if the statute of limitations is two years. If it's five years, it is not.

Title VI does not contain a statute of limitations. Instead, Monroe relies on *Beard v. Robinson*, 563 F.2d 331 (7th Cir. 1977), which held that "the Illinois five-year statute of limitations applies to statutory claims brought under the Civil Rights Acts." 563 F.2d at 338. Following *Beard*, the Supreme Court held that the applicable statute of limitations for section 1981 and section 1983 claims is the state period for personal injury torts. *See Wilson v. Garcia*, 471 U.S. 261, 280 (1985) (§ 1983);

---

[2] The Court previously dismissed Counts I-III as time-barred. *See* R. 62.

7

*Goodman v. Lukens Steel Co.*, 482 U.S. 656, 660-62 (1987) (§ 1981). In Illinois, the personal-injury statute of limitations is two years.[3] 735 ILCS 5/13-202.

However, so far as the Court can tell, the Seventh Circuit has not directly decided a statute of limitations question in the context of Title VI. *See Allen v. Bd. of Governors of State Colleges and Universities*, 78 F.3d 586, 1996 WL 102678 (7th Cir. 1996) (unpublished) ("The parties have contested the district court's application of Illinois' five-year statute of limitations on the Title VI claim. However, we need not decide this issue, since we hold on the merits that summary judgment for defendants was proper.") (internal citations omitted). Since *Garcia*, some district courts in this circuit have held that a five-year statute of limitations continues to govern claims under Title VI. *See, e.g.*, *Lewis v. Russe*, 713 F. Supp. 1227, 1232 (N.D. Ill. 1989); *Allen v. Bd. of Governors of State Colleges and Universities*, 1993 WL 69674, at *2 (N.D. Ill. Mar. 11, 1993); *Brewer v. Bd. of Trustees of the Univ. of Illinois*, 407 F. Supp. 2d 946, 961 (C.D. Ill. 2005), *aff'd*, 479 F.3d 908 (7th Cir. 2007). More recent cases have concluded that the personal-injury statute of limitations applies. *See, e.g.*, *Davis v. City of Springfield*, 2012 WL 5471951, at *7 (C.D. Ill. Nov. 9, 2012); *Robbins v. DePaul Univ.*, 2014 WL 7403381, at *2 (N.D. Ill. Dec. 29, 2014); *Rodgers v. Allen Superior*

---

[3] In 1990, Congress adopted a four-year statute of limitations for federal claims. 28 U.S.C. § 1658. However, "the Supreme Court has interpreted § 1658 to apply only 'if the plaintiff's claim against the defendant was made possible by a post-1990 enactment,' and to leave 'in place the 'borrowed' limitations periods for pre-existing causes of action.'" *Campbell v. Forest Preserve Dist. of Cook Cty., Ill.*, 752 F.3d 665, 667-68 (7th Cir. 2014) (quoting *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004)). Because Monroe's Title VI claim was not made possible by a post-1990 amendment, the four-year statute of limitations does not apply.

8

*Court*, 2017 WL 879635, at *3 (N.D. Ind. Mar. 6, 2017). Other courts have noted the tension but declined to take a position. *See C.S. v. Couch*, 843 F. Supp. 2d. 894, 906 n.15 (N.D. Ind. 2011) ("In the Seventh Circuit, however, the statute of limitations for Title VI claims is somewhat unclear."); *Torrespico v. Columbia College*, 1998 WL 703450, at *11 n.9 (N.D. Ill. Sept. 30, 1998).

The Court holds that Illinois's two-year statute of limitations for personal injury claims applies to claims under Title VI. First, *Beard*—the Seventh Circuit case applying a five-year statute of limitations—involved claims brought under 42 U.S.C. § 1981 and *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). But the Seventh Circuit has since held that the five-year statute of limitations no longer applies to either claim. *See Dandy v. United Parcel Service, Inc.*, 388 F.3d 263, 269 (7th Cir. 2004) (§ 1981); *Delgado-Brunet v. Clark*, 93 F.3d 339, 342 (7th Cir. 1996) (*Bivens*). That alone calls into question *Beard*'s continued viability. Moreover, the court decided *Beard* based on what it perceived as "fundamental differences between a civil rights action and a common law tort." *Beard*, 563 F.2d at 336. That reasoning is at odds with the Supreme Court's decision in *Garcia*, which based its holding on the similarities between tort claims for personal injury and claims under section 1983. *See Garcia*, 471 U.S. at 276-80. And the rationale from *Garcia* also applies to Title VI. As *Garcia* explained, section 1983 protects a "person" from a deprivation of rights and "creates a cause of action where there has been injury, under color of state law, to the person or to the constitutional or federal statutory rights which emanate from or are guaranteed to the person."

9

*Gomez*, 471 U.S. at 278 (quoting *Almond v. Kent*, 459 F.2d 200, 204 (4th Cir. 1972)). Thus, in "the broadest sense, every cause of action under § 1983 which is well-founded results from 'personal injuries.'" *Id.* Likewise, Title VI protects a "person" from discrimination. And an "injury resulting from discrimination produces impairments and wounds to the rights and dignities of the individual." *Baker v. Bd. of Regents of State of Kan.*, 991 F.2d 628, 631 (10th Cir. 1993). As such, Title VI claims can be fairly characterized as resulting from "personal injuries."

Indeed, every circuit to consider the question has held that the appropriate statute of limitations for Title VI claims is a state's limitations period for personal injury claims. *See Rozar v. Mullis*, 85 F.3d 556, 561 (11th Cir. 1996); *Baker*, 991 F.2d at 631; *Taylor v. Regents of Univ. of California*, 993 F.2d 710, 712 (9th Cir. 1993); *Egerdahl v. Hibbing Cmty. Coll.*, 72 F.3d 615, 618 (8th Cir. 1995); *Lillard v. Shelby Cty. Bd. of Educ.*, 76 F.3d 716, 729 (6th Cir. 1996) (in Title IX case stating that "a number of cases determining the limitations period for judicial proceedings under Title VI provide guidance by analogy. Indeed, all of the circuits deciding the issue have uniformly applied the state personal injury limitations period."); *Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 187 (4th Cir. 1999); *Thomas v. Care Plus of New Jersey, Inc.*, 484 F. App'x 692, 693 (3d Cir. 2012); *see also Frazier v. Garrison I.S.D.*, 980 F.2d 1514, 1521 (5th Cir. 1993) (affirming and stating that the "district court held that since Title VI, like § 1983, involved a claim of discrimination in public employment, considerations of fairness and uniformity dictated the same statute of limitations apply to a Title VI claim as to a § 1983 claim."); *Carter v. Univ.*

*of Connecticut*, 264 F. App'x 111, 112 (2d Cir. 2008) (noting that the parties do not dispute that Connecticut's personal injury statute of limitations applies to Title VI claim).

And while the Seventh Circuit has not expressly so held, language from several opinions indicates that that the forum state's personal injury statute of limitations also governs claims under Title VI. *See Sanders v. Venture Stores, Inc.*, 56 F.3d 771, 775 n.2 ("we will note that federal civil rights actions are governed by the personal injury statute of limitations in the state where the alleged injury occurred."); *Bush v. Commonwealth Edison Co.*, 990 F.2d 928, 933 (7th Cir. 1993) ("The Supreme Court has held that in borrowing statutes of limitations for federal civil rights cases the courts should look to state statutes governing personal injury suits."); *Porter v. U.S. Gen. Servs. Admin*, 151 F.3d 1033, 1998 WL 516785 (7th Cir. 1998), *amended*, 1998 WL 614752 (7th Cir. Aug. 17, 1998) (unpublished) ("We have long held that the proper statute of limitations for federal civil rights actions arising out of events in Illinois is two years.").

Accordingly, the Court finds that Title VI claims are subject to a two-year statute of limitations in Illinois. Because Monroe did not file this lawsuit within two years of the alleged unlawful conduct, his claim is time-barred. As such, the Court does not reach the merits of Monroe's claim. The Defendants' motion for summary judgment on Monroe's Title VI claim is granted.

## II. Intentional Interference with Contract (Count V)

To state a claim for tortious interference with contract, Monroe must establish: "(1) a valid contract, (2) defendant's knowledge of the contract, (3) defendant's intentional and unjustified inducement of a breach of the contract, (4) a subsequent breach of contract caused by defendant's wrongful conduct, and (5) damages." *Webb v. Frawley*, 906 F.3d 569, 577 (7th Cir. 2018) (citing *Healy v. Metro. Pier & Exposition Auth.*, 804 F.3d 836, 842 (7th Cir. 2015)).

Monroe correctly points out that not complying with provisions in an employee handbook or employment policy may constitute a contractual breach. R. 86 at 12-13. (citing *Duldulao v. St. Mary of Nazareth Hosp. Ctr.*, 505 N.E.2d 314 (Ill. 1987) and *Hentosh v. Herman M. Finch Univ. of Health Scis./The Chicago Med. Sch.*, 734 N.E.2d 125 (Ill. App. Ct. 2000)). But to establish tortious interference with contract, a breach still must occur. *See Strosberg v. Brauvin Realty Servs., Inc.*, 691 N.E.2d 834, 845 (Ill. App. Ct. 1998) ("in order to establish [intentional interference with contract] there must be evidence of a breach of contract caused by the defendant."). Both *Duldulao* and *Hentosh*, the cases Monroe cites to support his position, involved defendants who breached specific provisions of their employee handbooks. *See Duldulao*, 505 N.E.2d at 319-20; *Hentosh*, 734 N.E.3d at 128-29. In contrast, Monroe does not direct the Court to a single contractual provision that Columbia failed to follow. Columbia's Statement of Policy on Academic Freedom, Faculty Status, Tenure, and Due Process provides that a "faculty member with a Tenure-Track Appointment has the right to be evaluated in accordance with the procedures and criteria set forth in Section VI." R. 75 Ex. B at 5. In turn, Section VI outlines the

tenure evaluation procedure, including the multitiered review by department faculty, the Department Chair, the School Dean, and the Vice President for Academic Affairs. *See id.* 8-12. Monroe does not suggest that Columbia didn't follow that procedure. Rather, he broadly asserts that he "was contractually entitled to a fair tenure process, one untainted by a purposeful attempt to undermine him." R. 86 at 12. He then lists examples of ways Sheridan undermined his tenure bid, including assigning him to teach only introductory classes, harming his relationship with potential collaborators, and refusing to assign him coordinator positions. *Id.* at 13. But Monroe does not point to where his contractual agreement with Columbia guarantees him the right to teach advanced-level courses and/or hold a leadership position. Monroe's entire argument focuses on Sheridan's interference without ever addressing Columbia's breach. Because Monroe fails to put forth any evidence that Columbia breached its agreement with him, his claim fails. The Court grants summary judgment for Defendants on Count V.

III. **Intentional Interference with Prospective Economic Advantage (Count VI)**

Under Illinois law, to prevail on a claim for tortious interference with prospective economic advantage, a plaintiff must show: "(1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference." *Adelman-Reyes v. Saint Xavier*

13

*Univ.*, 500 F.3d 662, 667 (7th Cir. 2007) (quoting *Evans v. City of Chicago*, 434 F.3d 916, 929 (7th Cir. 2006)).

Defendants argue that Monroe's claim fails because he did not have a reasonable expectation of tenure. Monroe responds that Sheridan acted with discriminatory animus but otherwise ignores Defendants' argument. R. 86 at 13-14. The tenure process detailed in Columbia's Statement of Policy on Academic Freedom, Faculty Status, Tenure, and Due Process makes clear that a "faculty member with a Tenure-Track Appointment does not have a right to the renewal of his or her Appointment or to be granted a Tenured Appointment at the end of his or her Tenure-Track Period[.]" R. 75 Ex. B. at 5. The handbook contains no provisions that expressly or impliedly promise a tenure appointment. *See Goswami v. DePaul Univ.* 2014 WL 125600, at *6 (N.D. Ill. Jan. 14, 2014) ("The handbook's recital of procedures and criteria does not create a reasonable expectation of receiving tenure."). To the contrary, the handbook states that a "Tenured Appointment is a commitment that Columbia College Chicago makes only to the most talented persons who seek to become long-term members of its faculty." R. 75 Ex. B at 6.

Monroe does not cite a single case in which a court found a professor had a reasonable expectation of receiving tenure. And the lack of Monroe's reasonable expectation appears particularly clear here given the initial decision to terminate his employment after his third-year review. Even in President Carter's reversal of that decision, he informed Monroe: "For a faculty member to be awarded tenure at Columbia College Chicago, he/she must be able to demonstrate <u>clearly</u> having

14

achieved the standard of 'excellence' as a teacher; <u>it is the faculty member's responsibility to show evidence of this.</u> This standard is articulated clearly in the College's Tenure Document. I suggest strongly that you take advantage of every resource available to you, to ensure that your teaching continues to improve." R. 87 Ex. J (emphasis in original). That is a far cry from any reasonable assurance that Monroe would be granted tenure. Indeed, Sheridan's Department Chair Report, the All College Tenure Committee Report, and Love's letter denying Monroe tenure highlight similar teaching-related deficiencies previously identified in Monroe's third-year review evaluations. The Court recognizes Monroe's concern that implicit bias may partially account for some of his negative feedback (and that he may have received better evaluations had Sheridan assigned him to teach more graduate-level courses). But that is a separate question from whether Monroe ever had a reasonable expectation of receiving a tenure appointment. On this point, Monroe puts forth no evidence. *See Williams v. Weaver*, 495 N.E.2d 1147, 1152 (Ill. App. Ct. 1986) ("although [plaintiff] alleges numerous acts of wrongful conduct by the various defendants, [he] has presented no facts establishing the existence of a reasonable expectancy of an economic advantage or a continuing business relationship."). The Court is thus left to assume that Monroe merely hoped he would be granted tenure. And "the mere hope of continued employment, without more, does not . . . constitute a *reasonable* expectancy." *Montes v. Cicero Pub. Sch. Dist. No. 99*, 141 F. Supp. 3d 885, 900 (N.D. Ill. 2015) (alterations in original) (quoting *Williams*, 495 N.E.2d at 1152) (holding that plaintiff did not have a reasonable expectation of continued

employment); *see Goswami*, 2014 WL 125600, at *7 (plaintiff did not have a reasonable expectation of tenure even though she had consistently positive reviews because the tenure decision was highly discretionary). Accordingly, the Court grants summary judgment for Defendants.[4]

## Conclusion

For the reasons stated above, the Court grants the Defendants' motion for summary judgment [R. 73].

ENTERED:

*Thomas M Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: March 30, 2020

---

[4] Moreover, as an agent of Columbia, Sheridan holds a qualified privilege that protects him from being sued for tortious interference. *Adelman-Reyes*, 500 F.3d at 668. Sheridan loses that privilege if he acted "maliciously." *Id*. In this context, malice requires a "direct intention to injure" or a "reckless disregard" of Monroe's rights and the consequences that may result to him. *Id*. The Court doubts that Sheridan's conduct rises to the level of malice required for him to lose his privilege. *See id*. (evidence of an ongoing conflict between tenure candidate and school dean and comments without proper support in dean's adverse tenure recommendation insufficient to show malice). Nevertheless, because Monroe has failed to put forth evidence to fully satisfy the elements of his tortious interference claims, the Court need not make that determination here.

16